**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **SABRINA NUNN,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 13-cv-3140** |
| | : | |
| **NHS HUMAN SERVICES, INC.** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

_____

**DuBois, J.**                                                                          **June 8, 2015**

<u>**M E M O R A N D U M**</u>

## I.      INTRODUCTION

Plaintiff Sabrina Nunn filed suit against her former employer, NHS Human Services, Inc. ("NHS" or "defendant"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981 ("§ 1981"); and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Plaintiff's claims arise from defendant's failure to hire her for either the Director of Human Resources Services position or the Director of Human Resources Information Systems position, and the subsequent termination of her employment, which plaintiff asserts constituted discrimination on the basis of race and sex.[1]

Presently before the Court is defendant's Motion for Summary Judgment. For the reasons that follow, the Court grants defendant's Motion for Summary Judgment.

---

[1] In the Complaint, plaintiff also alleged that defendant's failure to hire her for the position of Executive Director of Human Resources constituted discrimination on the basis of race and sex. In her Brief in Opposition to Defendant NHS Human Services, Inc.'s Motion for Summary Judgment, however, plaintiff states that she will not pursue that claim. (Pl. Resp. 1 n.1.) Accordingly, the Court grants the Motion for Summary Judgment with respect to plaintiff's claim that defendant discriminated against her in not hiring her for the Executive Director of Human Resources position in violation of Title VII, § 1981, and the PHRA.

## II.     BACKGROUND[2]

### A.     Plaintiff's Employment History

Plaintiff is an African American female. (Pl.'s Counter Statement of Material Facts ("Pl. SOF") ¶ 2.) At all relevant times, plaintiff had a high school diploma,[3] and she was a Certified Professional in Human Resources ("PHR") and maintained certifications in Office Technology and Human Resources ("HR") Development. (Def.'s Statement of Undisputed Material Facts ("Def. SOF") ¶ 15; Pl.'s Resp. to Def.'s SOF ¶ 15.)

Plaintiff began her career in human resources at Children's Hospital of Philadelphia where she spent two years as the Human Resources Information System ("HRIS") Coordinator. (Pl. Resp. Ex. A) She then spent three years as an HR Generalist for Jewish Employment and Vocational Service in Philadelphia. (*Id.*) Subsequently, from 2000 to 2009, plaintiff operated an HR consulting company, K2K Consulting, where her clients included Campbell's Soup Co., Rohm and Haas Co., 7-Eleven, Inc., and the City of Philadelphia. (Def. SOF ¶¶ 4–5; Pl. SOF ¶ 14–15.) In this role, plaintiff designed and implemented HR interfaces and systems for these clients, in addition to providing other HR services. (Pl. SOF ¶ 16.)

Defendant hired plaintiff in January 2009 to serve as its Corporate Senior Director for HRIS/HR Projects. (Def. SOF ¶ 8; Pl. SOF ¶ 17.) The position required either a bachelor's degree or 8–10 years of human resources experience. (Mot. for Summ. J. Ex. 4.) In this position,

---

[2]     As required on a motion for summary judgment, the facts set forth in this Memorandum are presented in the light most favorable to plaintiff, the non-moving party. The Court refers to the parties' statements of material facts where those facts are not controverted. Where they are controverted, the factual disputes are noted.

[3]     As of January 2014, plaintiff was working toward her bachelor's degree at Pennsylvania State University. (Nunn Dep. Tr. 18:1–5.)

plaintiff was responsible for managing defendant's HRIS system, named Kronos, and implementation of HR projects, and supervised two employees. (Mot. for Summ. J. Ex. 4; Def. SOF ¶ 10; Pl. SOF ¶¶ 18, 20.) Plaintiff reported to JoAnn Edwards, defendant's Vice President of Human Resources, until Ms. Edwards's termination in December 2010. (Def. SOF ¶ 12; Pl. SOF ¶¶ 17, 26.)

While supervising plaintiff, Ms. Edwards evaluated plaintiff on two occasions. In both reviews, Ms. Edwards rated plaintiff "Superior" in ten out of twelve categories, including "Overall Rating," and rated plaintiff "Satisfactory" with respect to her interactions with her co-workers and her team building skills. (Def. SOF ¶ 13; Mot. for Summ. J. Ex. 5–6.) In plaintiff's 2010 performance evaluation, Ms. Edwards stated:

> Developing and monitoring effective work/team relationships is essential for successful implementation of HRIS projects, initiatives and training. Sometimes Sabrina gets frustrated due to the complexity and time required to roll-out/implement new HR initiatives and projects. Sabrina is working on keeping her frustration in check as she has a good understanding of the complexity of [defendant] NHS. Cooperation with others, team building and effective work relationships are essential for maximizing Sabrina's goals for the upcoming year.

(Mot. for Summ. J. Ex. 6.)

Defendant's Executive Vice President of Corporate Administration, Leah Pason, also observed that plaintiff had issues with teambuilding and that her interpersonal skills were "a little bit too direct" and could tend to "rub[] people the wrong way a little bit." (Pason Dep. Tr. 44:11–22.) Other colleagues, however, have attested to plaintiff's strong leadership skills and her reputation as a team player. (Pl. Resp. Ex. K–M.)

**B.      Defendant's Decision to Restructure its HR Department**

In mid-2010, defendant undertook a restructuring of its HR Department. (Def. SOF ¶ 16; Pl. SOF ¶ 25.) As part of this process, defendant "created an entire new structure including establishing new positions that were posted internally and externally." (Def. SOF ¶ 17.) Current HR employees, including plaintiff, were required to re-apply for positions. (Def. SOF ¶¶ 18, 26; Pl. SOF ¶ 27.) According to defendant, if "an internal HR staff member did not fit into the restructured department, they would be let go." (Def. SOF ¶ 18.) Some HR employees resigned, were demoted, or were terminated because there "were no positions [for them] within the new HR structure." (Def. SOF ¶ 19.)

**C.      Director of Human Resources Services Position**

In early 2011, plaintiff applied for the position of Director of Human Resources Services ("HR Services Director"), a newly-created position that would report directly to the new Executive Director of Human Resources, Michael Ernst, a white male. (Def. SOF ¶ 49; Pl. SOF. ¶¶ 28, 31.) The position included the following "principal accountabilities":

- Establish strategic direction for the Human Resources Services (HRS) [Center of Excellence] based on HRO strategic vision;
- Manage subject matter experts in issues related to HRS (technology, benefits, credentialing, and policy);
- Collaborate with internal and external partners (e.g., IT, Payroll, Benefits Vendors) to develop and execute an approach to best support employee needs;
- Leverage resources to respond to organizational priorities and employee transactional requirements;
- Design, develop, and implement policies and procedures to support transactional HR services;
- Ensure systems are established to maintain consistent adherence to NHS policy, Federal and state laws, and best practices;
- Develop and encourage strong customer focus in the provision of services to employees;

- Develop, analyze, and report key performance metrics to demonstrate HRS value; and
- Demonstrate and promote NHS Core Values and Leadership Principles.

(Mot. for Summ. J. Ex. 16)

Defendant also identified the following qualifications for the position:

(1) Masters or Advanced-Level Degree in HR, Business Administration, Organizational Development, or related field;
(2) 8–10 years of experience in Human Resources and Administration;
(3) SPHR/PHR Certification preferred;
(4) Proven track record of effective department leadership and team management;
(5) Demonstrated experience with strategy development and execution.

(*Id.*) Defendant sought a "strong HR leader with a wide breadth of experience that included working inside of a large organization, significant experience managing people, HR functions and strong educational credentials." (Def. SOF ¶ 51 (citing Ernst Dep. Tr. 78:3–24, 79:1–10).)

On March 22, 2011, plaintiff interviewed with Mr. Ernst for the HR Services Director position. (Def. SOF ¶ 54; Pl. SOF ¶ 31.) During the interview, Mr. Ernst told plaintiff he was concerned that she had interpersonal issues with her colleagues; specifically, Mr. Ernst said he had observed her cutting people off in meetings and talking over them, and he expressed concern that her behavior made her colleagues feel that she undervalued them. (Ernst Dep. Tr. 28:14–23, 31:23–24, 32:1; Nunn Dep. Tr. 156:20–23.) Following the interview, plaintiff wrote to Mr. Ernst, stating:

I appreciated you expressing your one concern [about my interpersonal issues]….
I do recognize that perception is reality and that what I think, say and do can have a positive or negative impact on me, the team and the organization. With that said, you no longer need to be concerned, to eliminate the negative I will be much more diplomatic with my directness and I thank you for your candid feedback.

(Mot. Summ. J. Ex. 18; *see also* Nunn Dep. Tr. 156:20–23.)

On March 30, 2011, plaintiff was informed that she was one of three finalists for the job, and the only internal finalist. (Pl. SOF ¶¶ 35–36.) However, two weeks later, plaintiff learned that the position was being offered to a Michelle Cygan, a white female and outside hire. (Def. SOF ¶ 59; Pl. SOF ¶ 37.) Ms. Cygan held a B.A. in Organizational Management from Cabrini College and had 21 years of experience in the human resources field, including three years as the Director of Human Resources for BioScrip, Inc., a national retail/mail order pharmacy, home infusion, and home healthcare services company with 4,000 employees in 30 states and 60 locations. (Def. SOF ¶ 62; Mot. for Summ. J. Ex. 19–20.)

On April 28, 2011, plaintiff received an email from Mr. Ernst stating that Ms. Cygan had not accepted the offer of employment for personal reasons, but that defendant had "identified another equally strong candidate through the search process and [is] re-engaging with him." (Pl. Resp. Ex. F; *see also* Def. SOF ¶ 63; Pl. SOF ¶ 37.) In May 2011, Michael Oglensky, an external candidate and white male, was hired for the position. (Def. SOF ¶ 64.) Mr. Oglensky had not applied for the HR Services Director position, but defendant identified him for the position after interviewing him for two other director-level HR positions. (Def. SOF ¶ 64; Pl. SOF ¶¶ 38–39.)

Mr. Oglensky held a BA in Industrial Relations and an MBA in Business Management, was working toward a doctorate in Organizational Management, and was certified as a Senior Professional in Human Resources ("SPHR"). (Mot. for Summ. J. Ex. 24; Oglensky Dep. Tr. 28:18–19.) Mr. Oglensky had 18-years of experience in the human resources field, including eight years as a director of human resources with a number of large companies. (Mot. for Summ. J. Ex. 24.) At Lonza Group, Ltd., for example, Mr. Oglensky served as the Head of Human Resources for the company's site in Conshohocken, Pennsylvania, where he had full

responsibility for all human resources functions for the site's 400 employees. (Oglensky Dep. Tr. 9:6–10.) Previously, Mr. Oglensky served as the Director of Human Resources and Global Leadership/Management Development at Kulicke & Soffa Industries, Inc., a $700 million global supplier of semiconductor assembly equipment with 3,000 employees. (Mot. for Summ. J. Ex. 24.) In that role, Mr. Oglensky was in charge of developing management and leadership training initiatives and provided human resources support to IT and finance organizations across the company. (*Id.*; Oglensky Dep. Tr. 11:5–10.) Mr. Oglensky also served as one of several directors of human resources for the Schering-Plough Corp., a major pharmaceutical manufacturer, where he was responsible for providing human resources leadership to a 1,100-employee Supply Chain and Quality Organization site in New Jersey. (Mot. for Summ. J. Ex. 24.) He also served as Director of Human Resources at one site of Honeywell International, Inc. and as Vice President of Human Resources for Advanta Corp., an equipment leasing company with 325 employees, where Mr. Oglensky supervised "all HR activities, including staffing, compensation and benefits, learning and development, and HRIS." (*Id.*)

Mr. Oglensky began his employment with defendant in May 2011. (Oglensky Dep. Tr. 18:1.) He was initially in charge of HRIS activity, credentialing, call center, and employee benefits, and was later put in charge of employee records. (*Id.* 24:19–23.) Plaintiff contends that Mr. Oglensky was not qualified for the position because he had no direct experience managing HRIS or employee records, no credentialing or HR call center experience, and less than three years of experience managing employee benefits.[4] (Pl. SOF ¶¶ 45–49; Oglensky Dep. Tr. 10:2–

---

[4]    Mr. Oglensky did testify, however, that he had supervisory responsibility for HRIS functions and employee records at several of his previous jobs even though he did not directly

9, 10:21–24, 11:1, 13:5–12, 16:5–23, 25:7–12, 26:2–7.) Plaintiff argues that, in contrast, she had

extensive HRIS responsibility with defendant and experience with credentialing, HR call centers,

and employee benefits through her K2K consultancy work. (Pl. SOF ¶¶ 50–54.)

In January 2013, Mr. Ernst informed Mr. Oglensky that he was concerned with his

performance and with his ability to continue in the HR Services Director role. (Pl. SOF ¶¶ 55–

56; Oglensky Dep. Tr. 35:2–24.) Mr. Oglensky's employment with defendant was terminated in

August 2013. (Oglensky Dep. Tr. 35:23–24, 36:1–2.)

**D.     Director of Human Resources Information Systems Position**

After plaintiff was informed that she would not be hired as the HR Services Director, she

applied for the Director of Human Resources Information Systems position ("HRIS Manager").

(Def. SOF ¶ 72; Pl. SOF ¶ 58.) Defendant identified the following desired qualifications for the

position:

> (1) Bachelor's Degree in Human Resources, Information Systems, related
> field, OR equivalent experience
> (2) 7+ years experience in Human Resources field, with a focus on
> HRIS/Kronos systems management
> (3) Proven track record of department leadership and team management
> (4) SPHR/PHR certification preferred.

(Mot. for Summ. J. Ex. 26.) The position was responsible for, *inter alia*, "all aspects of the

administration and management of the HR system (Kronos) at NHS," maintenance of internal

database files and tables, development of custom reports to meet the needs of management and

staff, supervision of two staff members in the entry and maintenance of Kronos data,

collaboration with IT departments to coordinate efforts related to HRIS training and

---

manage these functions, and that he had indirect experience with non-HR call centers. (Oglensky
Dep. Tr. 10:6–7, 16:8–15, 26:2–7.)

enhancement, and provision of technical expertise to troubleshoot issues and evaluate new systems, as needed. (*Id.*) Plaintiff contends that the HRIS Manager position included many of the same duties that she performed for over two years as defendant's Corporate Senior Director for HRIS/HR Projects, particularly those related to HRIS and Kronos systems management. (Pl. SOF ¶¶ 65, 67.)

On May 20, 2011, plaintiff interviewed with the newly-hired Mr. Oglensky for the HRIS Manager position. (Def. SOF ¶ 76.) Defendant contends that Mr. Oglensky came away from the interview "with concerns about plaintiff's ability to implement a transition from an operational standpoint due to her interpersonal skills and certain comments she made in her interview" that led Mr. Oglensky to believe she was not a solution-oriented person. (Def. SOF ¶ 76; Oglensky Dep. Tr. 68:20–24, 69:1–8.) For example, Mr. Oglensky testified at his deposition that plaintiff had told him that she "did not believe in best practices," which Mr. Oglensky thought were essential to the process of transforming defendant's HR platform. (Oglensky Dep. Tr. 54:13–17.) Mr. Oglensky also testified that plaintiff told him that she did not like defendant's Kronos system but did not offer any suggestions to improve it. (*Id.* 54:19–21.) Ultimately, defendant hired Randy Gilbert, a white male and outside hire, for the HRIS Manager position. (Def. SOF ¶ 80; Pl. SOF ¶ 70.)

Mr. Gilbert possessed a BS in business administration and an MBA, and had fifteen years of experience in the information management and IT fields. (Mot. for Summ. J. Ex. 28.) From 1996 to 2001, for example, Mr. Gilbert worked as the Management Information Services Director at Ken-Crest Services, Inc., where he managed all of Ken-Crest's information technology needs and managed upwards of six employees in the IT Department. (Gilbert Dep.

Tr. 9:15–23, 10:16–19.) Subsequently, starting in 2001, Mr. Gilbert spent 10 years as the Senior

Systems Analyst for Elwyn, Inc. where he supported both the HR and Payroll Departments in

their information and reporting functions, including implementing two new HR systems, and

worked with an HR system from ADP that was similar to Kronos. (Gilbert Dep. Tr. 11:21–24,

12:1–11, 26:20–24, 27:1.) Mr. Gilbert, however, had never worked directly in a human resources

position and had no HR education or certifications. (Gilbert Dep. Tr. 7:17–24, 8:8–23.) In his

interview with Mr. Ernst, Mr. Gilbert stated that he had never worked with the HR module of

Kronos, only the Kronos timekeeping function, and that he would have to get "up to speed" on it.

(Gilbert Dep. Tr. 22:13–24, 23:1–2, 23:7–15; Ernst Dep. Tr. 62:4–19.)

Plaintiff contends that Mr. Gilbert was not qualified for the HRIS Manager position as he

lacked direct experience in human resources, had limited knowledge of Kronos, and did not

possess any HR certifications. (Pl. SOF ¶¶ 70–71, 76–78.) Defendant asserts that Mr. Gilbert was

the stronger candidate because he had information systems management skills and technical

expertise from his previous positions that would allow him to provide leadership in transitioning

defendant's HR activity to a centralized system. (Oglensky Dep. Tr. 67:1–17, 102:16–18.)

Defendant also valued Mr. Gilbert's strong educational credentials, his experience managing

larger teams than plaintiff, and his prior work with defendant's competitors in the industry, like

Elwyn, Inc. (Def. SOF ¶¶ 83–84; Oglensky Dep. Tr. 104:23–24.)

Plaintiff also argues that Mr. Oglensky and Mr. Ernst, who made the hiring decision for

the HRIS Manager position, were biased against her as demonstrated by comments that Mr.

Ernst made to Mr. Oglensky about plaintiff's "behavior issues." According to Mr. Oglensky, Mr.

Ernst told him that plaintiff "was very abrasive," and "that [Mr. Ernst] was not decided on her as an individual in the organization." (Pl. SOF ¶¶ 84–85; Oglensky Dep. Tr. 52:7–16.)

Defendant offered Mr. Gilbert the HRIS Manager position after an initial interview with Mr. Oglensky and a second interview with Mr. Oglensky and Mr. Ernst. (Gilbert Dep. Tr. 21:12–17.) Mr. Gilbert accepted the offer in June 2011. (Mot. for Summ. J. Ex. 30.) According to Mr. Oglensky, Mr. Gilbert's performance at HRIS Manager was only "borderline satisfactory." (Oglensky Dep. Tr. 111:1–3.) Defendant terminated Mr. Gilbert's employment in February 2014. (Def. SOF ¶ 85.)

### E.    Defendant Terminates Plaintiff's Employment

According to plaintiff, on June 29, 2011, Mr. Ernst informed her that her employment with defendant was being terminated. (Pl. SOF ¶ 89.) During this conversation, Mr. Ernst told plaintiff that "you think at a higher level than even where we are now" and that due to fiscal constraints there was no role for her in the new structure. (Pl. SOF ¶ 90; Ernst Dep. Tr. 117:5–24, 118:1–24, 119:1–7.)

Defendant contends that, prior to the end of plaintiff's employment, Mr. Ernst made an effort to create a business analyst position for plaintiff and discussed the possibility with her. (Def. SOF ¶¶ 86–87.) Ultimately, however, the business analyst position could not be filled due to budgetary concerns. (Def. SOF ¶ 87.)

## III.   LEGAL STANDARD

A court should grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is

material when it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support a claim. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (citations omitted). The party asserting a fact "must support the assertion by . . . citing to particular parts of material in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).

## IV.     DISCUSSION

Plaintiff claims that defendant discriminated against her when it declined to hire her for the positions of HR Services Director and HRIS Manager and subsequently terminated her employment. It is plaintiff's position that this conduct constitutes discrimination on the basis of race and sex in violation of Title VII, § 1981, and the PHRA. The Court first addresses plaintiff's failure to hire claims followed by her termination claim.

### A.    Plaintiff's Failure to Hire Claims

#### 1.    McDonnell Douglas Burden-Shifting Analysis[5]

The parties agree that plaintiff's discrimination claims should be analyzed using the three-step burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6] *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1008 (3d Cir. 1997). Under this framework, plaintiff must first establish each element of a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If plaintiff establishes a *prima facie* case, the burden then shifts to defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *See id.* This burden is one of production, not persuasion. *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009). If defendant offers a legitimate, nondiscriminatory reason for its actions, in order to survive summary judgment, plaintiff must submit evidence "to demonstrate that the employer's proffered rationale was a pretext for [ ] discrimination." *Id.* Notwithstanding this burden-shifting framework, plaintiff bears the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against her. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799 n.10 (3d Cir. 2003).

---

[5]    Plaintiff's claims under Title VII, § 1981, and the PHRA are all analyzed under the same *McDonnell Douglas* standard. *Coleman v. Blockbuster, Inc.*, 352 F. App'x 676, 680 (3d Cir. 2009); *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) ("We construe Title VII and the PHRA consistently."). Thus, the Court's analysis applies with equal force to each of her claims.

[6]    In the absence of direct evidence of discrimination, a plaintiff can show discrimination using the burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1008 (3d Cir. 1997).

## 2.     ***Prima Facie* Case Under Title VII, § 1981, and the PHRA**

A plaintiff makes out a *prima facie* case of discriminatory failure to hire by showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) despite her qualifications she was rejected for the position; and (4) she was rejected for the position "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995) (citing *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). At the *prima facie* stage, a plaintiff must present evidence that "establish[es] some causal nexus between [her] membership in a protected class and the decision not to [hire her]." *Sarullo*, 352 F.3d at 798.

Defendant concedes that the first and third elements of the *prima facie* case are met but asserts that the second element is not met with respect to plaintiff's claims regarding the HR Services Director position and that the fourth element is not met with respect to plaintiff's claims regarding either position. (Mot. for Summ. J. 5.) For the following reasons, the Court concludes that plaintiff has established the second element of her *prima facie* case with respect to the HR Services Director position. Regarding the fourth element, the Court determines that plaintiff has failed to raise a genuine dispute of material fact as to whether she was rejected for the HR Services Director position under circumstances that give rise to an inference of unlawful discrimination. However, plaintiff *has* raised a genuine dispute of material fact as to whether she was rejected for the HRIS Manager position under such circumstances.

### (i)     Second Element of Plaintiff's *Prima Facie* Case

In order to establish the second prong of the *prima facie* case, plaintiff "must point to evidence from which a factfinder could reasonably infer that [] plaintiff satisfied the [criteria]

identified by the employer or that the employer did not actually rely upon the stated criteria." *Rodriguez*, 2012 WL 2343306 at *6 (quoting *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998)), *aff'd* 532 F. App'x 152 (3d Cir. 2013). A plaintiff may satisfy this burden by demonstrating that "[s]he was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992) (quoting *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 171 (3d Cir. 1991)).

In this case, defendant does not dispute that plaintiff was qualified for the HRIS Manager position, but argues that no factfinder could reasonably conclude that plaintiff was qualified for the HR Services Director position as she had not earned a college degree and had "no true leadership experience." (Mot. for Summ. J. 6.) The Court concludes, however, that plaintiff has demonstrated that she was sufficiently qualified to be among those persons from whom a selection for the HR Services Director position would be made based on the fact that defendant chose to interview her and selected her as a finalist for the position. The case of *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265 (3d Cir. 2005), is instructive on this issue.

*Hugh* concerned a plaintiff who, while employed by the Butler County Family YMCA ("the YMCA"), was promoted to serve as Director of the YMCA's Big Brothers, Big Sisters program despite the fact that she lacked certain objective qualifications for the position. The YMCA knew that plaintiff Hugh did not meet these qualifications but nonetheless promoted her. Hugh was ultimately terminated and brought an employment discrimination suit against the YMCA. The YMCA then argued that Hugh could not establish the second prong of the *prima facie* case because she lacked certain qualifications for the Director position. The Third Circuit,

however, held that the fact that the YMCA had promoted Hugh demonstrated that the YMCA believed her "prior satisfactory performance sufficient qualification for the position of Director of the Big Brothers, Big Sisters program" and thus her promotion was "an acknowledgment that she was qualified at the time." 418 F. 3d at 268. Consequently, the Third Circuit concluded that the YMCA could not argue that Hugh was unqualified for the position. *Id.*

Similarly, in the present case, defendant chose to interview plaintiff as part of a select group of 8–10 applicants despite knowing that she did not possess all of the objective qualifications for the job such as an advanced degree, (Ernst Dep. 76:11–17, 77:21–24, 79:15–24), and selected her as one of the three finalists for the position, (Pason Dep. 86:7–11; Nunn Dep. 147:19–22, 148:2–4). Additionally, Mr. Ernst testified that there were circumstances under which plaintiff could have been hired for the position, and that he still considered hiring her after her interview. (Ernst Dep. Tr. 82:22–24, 85:14–21.) The evidence thus demonstrates that defendant considered plaintiff's experience sufficient to include her "among those persons from whom a selection … would be made." *Ezold*, 983 F.2d at 523. As in *Hugh*, the Court concludes that defendant cannot now argue that plaintiff was not qualified for the HR Services Director position, and thus plaintiff has established the second prong of the *prima facie* case with respect to that position.

(ii)     Fourth Element of Plaintiff's *Prima Facie* Case

To establish the fourth element of the *prima facie* case, plaintiff must show that the adverse employment action was made "under circumstances that give rise to an inference of unlawful discrimination." *Waldron*, 56 F.3d at 494. Plaintiff may satisfy this element by demonstrating that defendant filled the HR Services Director and HRIS Manager positions by

selecting someone of lesser or equivalent qualifications who was not a member of plaintiff's protected class. *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 540–41 (3d Cir. 2006) (noting that, in order to establish a *prima facie* case of discrimination, courts should look to the hiring decision to determine if plaintiff was at least as qualified as the person selected for the position, not necessarily better qualified than that person) (citing *Pinckney v. Cnty. of Northampton*, 512 F. Supp. 989, 998 (E.D. Pa. 1981), *aff'd* 681 F.2d 808 (3d Cir. 1982)); *Rodriguez v. Nat'l R.R. Passenger Corp.*, No. 11-0043, 2012 WL 2343306, at *7 (E.D. Pa. June 20, 2012) (DuBois, J.) (concluding that plaintiff failed to establish the fourth prong of the *prima facie* case as, *inter alia*, he could not show that he was at least as qualified as the person who was hired).

### a.  HR Services Director

In this case, plaintiff contends that she was more qualified than Mr. Oglensky, a white male, for the HR Services Director position and thus has established the fourth element of her *prima facie* case. (Pl. Resp. 19–20.) The Court rejects this argument. The Court concludes that there is no genuine dispute that Mr. Oglensky was more qualified for the position than plaintiff as Mr. Oglensky possessed certain required qualifications that plaintiff did not.

First, the HR Services Director position required a Masters or advanced-level degree in HR, business administration, organizational development, or a related field. Mr. Oglensky possessed a college degree and an MBA and was working on his doctorate in Organizational Management; plaintiff only had a high school education. Second, the position required 8–10 years of experience in HR and a "[p]roven track record of effective department leadership and team management." (Mot. for Summ. J. Ex. 16.) While plaintiff had worked for 16 years in the

HR field, Mr. Oglensky had spent 18 years in the field and had eight years of experience as a director of human resources at several large for-profit institutions. In contrast, plaintiff had never served as an HR director and had limited management experience. (Ernst. Dep. 80:17–18, 81:1–5; Nunn Dep. 157:20–24.)

Plaintiff argues that she was more qualified than Mr. Oglensky for the HR Services Director position because he had no direct experience managing HRIS or employee records, had no credentialing or HR call center experience, and had less than three years of experience managing employee benefits. In contrast, plaintiff had at least some direct experience with each of these HR functions. Plaintiff's argument fails, however, because the HR Services Director job description did not list direct experience with any of these functions as a required or preferred qualification for the position. Instead, the job description focused on candidates with high educational credentials and broad HR and management experience, all of which Mr. Oglensky had and plaintiff lacked.

In light of Mr. Oglensky's superior educational qualifications, his broad HR background, and his stronger management experience, the Court concludes that a factfinder could not reasonably find that plaintiff was at least as qualified as Mr. Oglensky for the HR Services Director position. For these reasons, the Court determines that plaintiff has not made out a *prima facie* case of discrimination with respect to the HR Services Director position because there is no genuine dispute of material fact as to the fourth element of the *prima facie* case.

### b.  HRIS Manager

The Court concludes that plaintiff has raised a genuine dispute of material fact as to whether she was at least equally qualified as Mr. Gilbert, a white male, for the HRIS Manager

position. At the outset, the Court notes that both plaintiff and Mr. Gilbert met many of the required qualifications for the position. First, the HRIS Manager position required a bachelor's degree or equivalent work experience; Mr. Gilbert possessed a bachelor's degree and MBA while plaintiff had 16 years of HR experience, which a factfinder could reasonably conclude was the equivalent of a bachelor's degree. Second, the HRIS Manager position required a minimum of seven years of experience in HR with a focus on HRIS/Kronos management. As noted above, plaintiff had 16 years of HR experience, including three years of HRIS/Kronos management while employed by defendant and two years with the Children's Hospital of Philadelphia. Mr. Gilbert had 10 years of experience at Elwyn, Inc. supporting HRIS functions from an IT perspective, although he only had limited experience with Kronos specifically. Finally, plaintiff possessed the preferred PHR certification while Mr. Gilbert had no HR certifications. In short, the Court determines that these facts are sufficient to raise a genuine dispute as to whether plaintiff was equally qualified for the HRIS Manager position as Mr. Gilbert.

### 3.    Remaining Steps of the *McDonnell Douglas* Framework

As plaintiff has made out a *prima facie* case of race and sex discrimination with respect to the HRIS Manager position, the Court proceeds to analyze this claim under the second and third prongs of the *McDonnell Douglas* burden-shifting test.

(i)    Defendant's Proffered Non-Discriminatory Reasons for its Actions

"Once a plaintiff establishes a *prima facie* case the law creates a presumption of unlawful discrimination, and the defendant employer must articulate a legitimate nondiscriminatory explanation for the employer's adverse employment action." *Barber*, 68 F.3d at 698 (quoting *Seman v. Coplay Cement Co.*, 26 F.3d 428, 432 (3d Cir. 1994)) (internal quotation marks

omitted). "If the employer puts forth a legitimate business explanation, then the presumption of discriminatory intent created by the employee's *prima facie* case is rebutted and the presumption simply drops out of the picture." *Id.*

The Court concludes that defendant has met its burden of production at the second step of the *McDonnell Douglas* framework. As discussed further below, defendant presented evidence that it did not hire plaintiff for the HRIS Manager position because she was not as qualified as Mr. Gilbert, and she had interpersonal issues that raised concerns about her teamwork and management skills. Defendant also presented evidence that plaintiff was not offered the HRIS Manager position because she stated that she did not want the job.

(ii)    Pretext

At the third step of the *McDonnell Douglas* framework, plaintiff must show that defendant's proffered legitimate non-discriminatory reasons are pretext for discrimination. *Burdine*, 450 U.S. at 252. To establish pretext, plaintiff must present "some evidence … from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. It is not enough that the employer's decision was "wrong or mistaken"; rather, a plaintiff must demonstrate that "the employer's articulated reason was … so plainly wrong that it cannot have been the employer's real reason." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Keller*, 130 F.3d at 1108–09) (internal quotation marks omitted). Plaintiff may do this by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal citations and quotation marks omitted). In sum, the inquiry is not "whether the employer is wise, shrewd, prudent or competent"; rather, the inquiry is "whether discriminatory animus motivated the employer." *Id.*

a.    <u>Qualifications for the HRIS Manager Position</u>

Plaintiff first argues that defendant's stated reason for hiring Mr. Gilbert for the HRIS Manager position — that he was better qualified for the position than plaintiff — is unworthy of belief because Mr. Gilbert did not have direct experience working in an HR department and had not worked with the HR module of Kronos. (Pl. Resp. 29.) However, "[m]ore than a denial of promotion as a result of a dispute over qualifications must be shown to prove pretext." *Bennun*, 941 F.2d at 170; *see also Rodriguez*, 2012 WL 2343306 at *9 ("The Court does not sit as a super employment court to decide the merits of employment decisions."). Instead, plaintiff must show that the differences in qualifications between herself and Mr. Gilbert are "so disparate that a reasonable factfinder could rationally conclude that [plaintiff] was clearly a better candidate for the job." *Waris v. Heartland Home Healthcare Servs., Inc.*, 365 F. App'x 402, 405 (3d Cir. 2010) (citing *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006)). The Court concludes that plaintiff has failed to make such a showing.

The record demonstrates that Mr. Gilbert possessed numerous qualifications that defendant valued for the HRIS Manager position and which plaintiff did not possess. In particular, Mr. Gilbert had both a bachelor's degree and an MBA, while plaintiff only had a high school degree; he had 15 years of experience working with defendant's competitors; and he had

technical expertise and experience in transitioning HR systems from decentralized to centralized functions, a process that defendant was preparing to undergo at the time. (Oglensky Dep. Tr. 67:1–5, 67:13–17.) Although Mr. Gilbert had not previously worked directly in an HR department, he had 10 years of experience at Elwyn, Inc. supporting the HR department with their information and reporting needs and was familiar with HR information systems that were similar to Kronos. In sum, Mr. Gilbert was both qualified for the HRIS Manager position and possessed experience that was particularly valued by defendant as it undertook to centralize its HR functions.

"An employer is permitted to decide which job criteria are important and to determine what skill set is most appropriate for a given position." *Conine v. Se. Pa. Transp. Auth.*, No. 03-3858, 2005 WL 639733, at *3 (E.D. Pa. Mar. 17, 2005) (DuBois, J.). Thus, plaintiff cannot establish pretext simply from the fact that defendant valued Mr. Gilbert's skills and experiences over the skills and experiences that plaintiff brought to the table. Furthermore, plaintiff cannot show that her qualifications were so clearly superior to Mr. Gilbert's that a factfinder could reasonably conclude that discrimination was the real reason for defendant's employment decision. Thus, the Court concludes that plaintiff has failed to raise a genuine dispute of material fact with respect to whether defendant's decision to hire Mr. Gilbert based on his qualifications was actually pretext for discrimination.

b.   Plaintiff's Interpersonal Issues

Plaintiff next contends that defendant's assertion that she was passed over for the HRIS Manager position due in part to her "interpersonal issues" is pretext for discrimination as "[c]ourts routinely find that this type of subjective criteria and analysis is often suspect in an

employment discrimination matter." (Pl. Resp. 30.) Plaintiff's interpersonal issues, however, were well documented in two performance reviews conducted by her supervisor, Ms. Edwards, in July 2009 and March 2010. Although plaintiff points to a number of positive references she received from colleagues in arguing that she did not actually have interpersonal issues, (Pl. Resp. 32–34), she concedes that Ms. Edwards did not discriminate against her in conducting the evaluations. (Nunn Dep. Tr. 87:23–88:1, 89:16–20.)

As a general matter, a court will allow an employer to rely on its own subjective evaluations of an employee in making an employment decision, even if defendant errs in its assessment, "as long as error was not based on unlawful discrimination." *Sampath v. Concurrent Tech. Corp.*, 299 F. App'x 143, 146 (3d Cir. 2008) (citing *Ezold*, 983 F.2d at 547 n.38). As plaintiff concedes that the evaluations were not based on discriminatory animus, she cannot demonstrate that defendant's reliance on these evaluations in making its hiring decisions was pretext for discrimination.[7]

### c. Mr. Ernst's Remarks to Mr. Oglensky

Plaintiff further contends that a factfinder could reasonably conclude that discrimination was the real reason for defendant's decision not to hire her for the HRIS Manager position based on comments that Mr. Ernst made to Mr. Oglensky about plaintiff shortly before Mr. Oglensky

---

[7] Plaintiff also argues that a factfinder could reasonably conclude that her supposed "interpersonal issues" did not actually motivate defendant's employment decision because Leah Pason, defendant's Executive Vice President of Corporate Administration, testified that these issues were not a factor in defendant's hiring decision. (Pason Dep. Tr. 47:16–20.) However, Ms. Pason also testified that she played no role in the HRIS Manager hiring decision. (Pason Dep. Tr. 34:16–19.) Thus, the Court concludes that plaintiff's reliance on Ms. Pason's deposition testimony is not sufficient to raise a genuine dispute as to whether plaintiff's documented interpersonal issues actually played a role in defendant's employment decision.

interviewed her for the HRIS Manager position. (Pl. Resp. 31.) In particular, plaintiff argues that Mr. Ernst's comments — stating that she was "very abrasive" and had "behavior issues" (Oglensky Dep. Tr. 52:7–16) — are based on discriminatory stereotypes of African American women, and thus could lead a reasonable factfinder to conclude that discrimination was the real reason for defendant's decision not to hire her for the HRIS Manager position.[8] (Pl. Resp. 31.)

"Stray remarks are generally not sufficient standing alone to warrant a finding of pretext" and "must be considered *in toto* in light of the nature and context in which the comment was made." *Turner v. Leavitt*, No. 05-942, 2008 WL 828033, at *10 (W.D. Pa. Mar. 25, 2008) (citing *Keller*, 130 F.3d at 1112). In this case, the nature and context of Mr. Ernst's comments do not raise an inference of discriminatory animus as the record is devoid of evidence that his comments about plaintiff's behavior and interpersonal style were in any way connected to her race or sex. Instead, the record demonstrates that Mr. Ernst voiced a concern that was also expressed by Ms. Edwards, who plaintiff admits did not discriminate against her in this regard. Thus, the Court concludes that a factfinder could not "reasonably believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action" based on these comments. *Fuentes*, 32 F.3d at 764.

### d. Plaintiff's Interest in the HRIS Manager Position

Plaintiff next argues that defendant's final stated reason for not hiring her — that she lacked enthusiasm and did not actually want the job — is unworthy of credence because the fact that she applied for the position demonstrates that she did indeed want the job. (Pl. Resp. 30.)

---

[8]     Both Mr. Ernst and Mr. Oglensky participated in the HRIS Manager hiring decision. (Ernst Dep. Tr. 41:12–20.)

However, plaintiff admitted in her deposition that she initially told Mr. Ernst that she was not interested in the job because it would entail a pay cut. (Nunn Dep. Tr. 174:17–175:1, 189:10–15; *see also* Ernst Dep. Tr. 44:17–24.) In his deposition, Mr. Ernst testified that, based on these comments, he and Mr. Oglensky decided to hire someone who was more "excited and enthused" about the position than plaintiff. (Ernst Dep. Tr. 44:17–24.) The Court concludes that there is no factual dispute that plaintiff had some doubts about the HRIS Manager position, which she expressed to Mr. Ernst during the hiring process, and thus the fact that she applied for the position does not render defendant's concern about her level of interest implausible or unworthy of belief.

Plaintiff further contends, however, that defendant's reliance on her "lack of enthusiasm" for the HRIS Manager position is pretextual because Mr. Oglensky, a white male, was hired for the HR Services Director position despite the fact that he never applied for the position and expressed concerns to Mr. Ernst about his fitness for the job. When using a comparator to establish pretext, plaintiff must show that an individual not of her protected class was "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Morris v. G.E. Fin. Assurance Holdings*, No. 00-3849, 2001 WL 1558039, at *6 (E.D. Pa. Dec. 3, 2001); *see also Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 F. App'x 202, 206 (3d Cir. 2003) (noting that individuals are similarly situated only where they engaged in "the same conduct").

In this case, Mr. Oglensky is not a suitable comparator to plaintiff. First, plaintiff and Mr. Oglensky made their comments in the context of different hiring processes that involved a different mix of candidates and distinct hiring considerations. Second, plaintiff and Mr.

Oglensky expressed qualitatively different concerns to Mr. Ernst: plaintiff stated that she was hesitant about assuming the HRIS Manager job because it would entail a substantial pay cut, while Mr. Oglensky noted his concerns as to whether he was the best candidate for the HR Services Director position. (Oglensky Dep. Tr. 24:8–12.) Mr. Oglensky's comments did not suggest a lack of enthusiasm for the position and thus would not have raised the same concerns that he was not "excited and enthused" about the position.  In short, Mr. Oglensky engaged in different conduct in a separate hiring process in which defendant weighed different considerations and reviewed different candidates. As Mr. Oglensky was not similarly situated to plaintiff, Mr. Ernst's treatment of his comments in the HR Services Director hiring process is not probative of discrimination against plaintiff in the HRIS Manager hiring process.

In sum, plaintiff has failed to present any evidence from which a reasonable factfinder could conclude that defendant failed to hire her for either the HRIS Manager or HR Services Director position on the basis of her race or sex. The Court thus determines that defendant's motion for summary judgment should be granted as to plaintiff's failure to hire claims.

### B.      Plaintiff's Discriminatory Termination Claim

Finally, the Court concludes that plaintiff has not raised a genuine dispute of material fact as to whether the subsequent termination of her employment with defendant was discriminatory. Plaintiff does not contest the fact that defendant underwent a complete restructuring of its HR department, which led to the termination of employees who did not fit in the new structure. (*See, e.g.*, Pason Dep. Tr. 27:1–3 (stating that the HR department underwent a downsizing that required the termination of existing employees who did not find new roles in the organization).) Nor is there any evidence demonstrating that the restructuring was generally conducted in a

discriminatory manner. Instead, plaintiff's discriminatory termination claim is based solely on the argument that she was discriminated against when defendant failed to hire her for any of the new positions for which she applied. As plaintiff has not raised a genuine dispute of material fact with respect to her failure to hire claims, the Court concludes that her discriminatory termination claim also fails and that defendant's motion for summary judgment should be granted as to this claim.

**V.     CONCLUSION**

For the above reasons, the Court grants defendant's Motion for Summary Judgment. An appropriate order follows.